{¶ 1} In October 2005, a Cuyahoga County Grand Jury returned a five-count indictment against defendant-appellant, Otis Gooden. The indictment charged him with: 1) aggravated robbery, with firearm specifications, in violation of R.C. 2911.01; 2) aggravated burglary, with firearm specifications, in violation of R.C. 2911.11; 3) kidnapping, with firearm specifications, in violation of R.C. 2905.01; 4) safecracking, in violation of R.C. 2911.31; and 5) theft, in violation of R.C. 2913.02. The indictment arose out of an armed robbery/burglary that occurred near midnight on August 20, 2005, at a CVS drugstore in Richmond Heights, Ohio. Gooden, who was 18 years old at the time of the events at issue, was employed as a clerk at the CVS store.
 {¶ 2} Gooden pled not guilty and waived his right to a jury trial.
 {¶ 3} At trial, Kristen Mitchell, an assistant manager at CVS, testified that she and Gooden were the only two employees in the store that evening and were responsible for closing the store at midnight. Kristen testified that she had worked with Gooden for several months and had regularly closed the store with him.
 {¶ 4} Among the duties the employees perform during closing is gathering the registers, counting the money, putting the money in the store safe — which is located in the store office — and then locking the safe. Kristen testified that the safe is a "punch code safe" that is opened by punching in a code on a keypad by the safe.
 {¶ 5} She testified further that after the closing is completed, her normal practice is to go to the floor and set the alarm. Once the alarm is set, the employees *Page 4 
have only a few seconds to exit the store before the motion sensor for the alarm is activated.
 {¶ 6} On the night in question, Kristen was done with her closing duties at approximately five minutes after midnight. She had gathered her belongings and had proceeded to set the alarm when Gooden told her that he had to go to the bathroom. Kristen waited for Gooden so she could set the alarm, but after a few moments, he paged her over the store's PA system and told her that something was wrong with the door and she should come to the back. Kristen headed to the back of the store, and, about halfway there, was met in an aisle by Gooden.
 {¶ 7} Kristen testified that she and Gooden headed back to the bathroom. She did not see anything wrong with the bathroom door, although it was open slightly. When she reached for the door handle to open the door, a masked man, dressed fully in black, walked out of the bathroom with a gun. According to Kristen, the man "pointed the gun at us," and then asked who the manager was. Kristen told him that she was the manager, and the man then asked her if she was pregnant. She said that she was, and the man then asked for the safe code and if there was any rope in the store. Kristen gave the man the six-digit code to the safe.
 {¶ 8} Gooden told the masked man that there was rope on the sales floor in the store, and the man told him to go get it. Gooden returned with rope and masking tape. The masked man told Gooden to use the tape to tie Kristen's hands and legs, which Gooden did. The man told Gooden that if Kristen got loose, he would shoot *Page 5 
him. The masked man then took Kristen's car and store keys and ordered her into the men's bathroom. Kristen testified that she remained in the bathroom, unable to hear anything that was happening, until the police came, approximately two hours later.
 {¶ 9} Kristen testified that she and Gooden complied with every demand of the masked man and there was nothing about Gooden's behavior that made her think he was involved in the robbery.
 {¶ 10} Richmond Heights police detective Michael Gerl testified that he responded to the CVS store at approximately 1:45 a.m. after receiving a radio call regarding a possible robbery there. He secured the outside of the store and waited for backup before proceeding inside the store.
 {¶ 11} Gerl testified that the police carefully checked each aisle, in case someone was still hiding in the store. At the rear of the store, the police found Kristen in the men's bathroom, with her hands and legs still taped. After Kristen told the police that she and Gooden had been robbed and she did not know who the robber was or where he went, the police told her to stay in the bathroom while they searched the rest of the store.
 {¶ 12} According to Gerl, the police were startled a few moments later, as they were checking the employee lounge area, to see a male wearing a blue CVS shirt walk out of the back area. Gerl testified that they did not know who the man was and he was "walking straight forward * * * as if he was going to leave the store," so they *Page 6 
immediately drew their guns and ordered him to the ground.
 {¶ 13} After determining that the male was Gooden, the police asked him where he was going, and Gooden told them that he was walking to the front of the store because he thought he had heard them there. The police then escorted him out of the store and talked to him. Gooden told them that the store had been robbed, but according to Gerl, "he was very nonchalant and wasn't really trying to find out. We weren't getting any information from him. He was, you know, as far as we knew, just a suspect that was being uncooperative and didn't want to give up any information, or who he was."
 {¶ 14} Gerl testified that the police then read Gooden hisMiranda rights and asked him more questions about who the robber was and whether Gooden knew him. According to Gerl, Gooden "just was not cooperating in any way," so, "due to the circumstances," he was placed under arrest and taken to the police station.
 {¶ 15} CVS store manager Jacquelyne Friedman then arrived at the store. She determined that approximately $5,400 had been stolen from the safe, but nothing else was missing from the store. She testified that she had been training Gooden to be a store manager and had given him the code to the safe one week prior to the robbery. Friedman testified that CVS store employees are instructed, per store policy, to "just do what the perpetrator says to do" if a robber comes into the store.
 {¶ 16} Friedman testified further that the door to the office locks from the inside and that there are eight surveillance cameras at various locations in the store which *Page 7 
are activated by motion. She retrieved the surveillance videos for the evening and early morning hours of August 20 and 21 from the various cameras and gave them to the police. There is no audio on any of the videos.
 {¶ 17} The videos were admitted as evidence as State's Exhibits 1, 2, and 3. The first video shows a man wearing a black jacket and a black baseball cap entering the store at approximately 11:42 p.m. There are also two clips of this same man strolling up and down the store aisles from 11:42 to 11:44 p.m. There is a video of Gooden retrieving tape and rope from one of the store shelves at approximately 12:07 a.m.
 {¶ 18} There is also a video of Gooden and the now masked and hooded gunman entering the office and of the masked man standing over Gooden while he removed money from the safe from 12:14 a.m. to 12:19 a.m. This video shows Gooden leaving the office for approximately 30 seconds, and reentering the office at 12:15:46 a.m. At one point during this video, the gunman changes his shirt, and a gun is visible in his waistband.
 {¶ 19} Another video shows Gooden walking into the photo area next to the office at 12:15 a.m., retrieving a plastic bag, and taking it into the nearby office. There is also video of Gooden and the gunman, recorded from approximately 12:20 a.m. to 12:21 a.m., showing Gooden and the gunman walking into the stock room/receiving area, Gooden going into the trash compactor through its door, and the gunman leaving the area. Another video shows the gunman leaving the store alone, *Page 8 
carrying a bag, at approximately 12:22 a.m.
 {¶ 20} Gerl testified that Gooden was Mirandized at the station and asked by Gerl and another officer to give an accounting of his actions that evening. Gooden again told the officers that the store had been robbed, but did not elaborate. Gerl had looked at the store's surveillance video by this time, and asked Gooden about particular details from the video. Gerl testified that he felt Gooden was "deceptive in all his answers." For example, Gerl testified that when he asked Gooden if the gunman had held the gun on him during the robbery, Gooden answered affirmatively, but Gerl thought this answer was inaccurate because the video showed the gunman had the gun in his waistband and not in his hand when he and Gooden were in the store office. Gerl testified that Gooden told him that he knew the robber was in the store when he paged Kristen to come back to the bathroom, so Gerl asked Gooden why he did not try to alert her or try to escape from the store when he met Kristen in the aisle. Gerl also asked Gooden why he did not call 911 when the gunman told him to get rope from a store aisle and, later, when he was given an opportunity to leave the store office for a few seconds to get a bag while the gunman remained in the store office unloading the safe. Finally, Gerl asked Gooden why he did not check on Kristen or try to get her out of the bathroom when he exited the back room. In Gerl's opinion, Gooden did not have "adequate responses" to any of these questions about his lack of heroism.
 {¶ 21} Richmond Heights police detective Charles Duffy testified that several *Page 9 
days later, while Gooden was still in custody, he took two written statements from Gooden. In one, Gooden stated that as he was taking the trash out before closing on August 20, 2005, he heard someone ask him if he was the manager. He responded that the manager was a pregnant woman, and was told to "get her back here." Gooden stated that after he paged Kristen to the back of the store, the robber came out with a gun and told him to get some rope to tie her up. After Gooden did as instructed, the robber told Kristen he wanted "the keys and the codes." She gave them to him, and the robber then put her in the bathroom and told Gooden that he would die if she got free. He then told Gooden to "take him to the money," so Gooden took him to the office and opened the safe. The robber told Gooden to get him a bag for the money, so Gooden left to get a bag. Gooden returned to the office and helped put the money in the bag. The robber then told Gooden to give him a CVS shirt so he could get out of the store. After Gooden gave him a shirt and they left the office, the robber asked Gooden where he could put him so no one would find him. Gooden suggested the trash compactor; when they got there, the robber told Gooden to get in and take his clothes off and that he would kill him if he made any noise. Gooden stated that after waiting awhile in silence, he left the stock room, and then saw Detective Gerl.
 {¶ 22} In a second statement, Gooden told the police that the robber might have been a man known to him as "Davion Burton." Gooden recognized Burton and his voice from a confrontation he and Burton had one day while they were playing *Page 10 
basketball, during which Burton told Gooden (who was wearing a CVS shirt) that he might have to come rob the CVS store where Gooden worked. The police claimed they were unsuccessful in locating Burton.
 {¶ 23} After overruling Gooden's Crim.R. 29 motion for acquittal, the trial court found him guilty of all counts and sentenced him to six years incarceration.
 {¶ 24} Gooden now appeals. In his third assignment of error, Gooden contends that his counsel was ineffective for failing to challenge his warrantless arrest and failing to file a motion to suppress the oral and written statements he made to the Richmond Heights police after his arrest.
 {¶ 25} In order to establish ineffective assistance of counsel, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonable representation and that he was prejudiced by that performance. State v. Drummond, 111 Ohio St.3d 14,2006-Ohio-5084, at ?205, citing Strickland v. Washington (1984),466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct. 2052. Prejudice is established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, supra at 694.
 {¶ 26} Gooden argues that there was no probable cause for his warrantless arrest and detention and, therefore, his oral and written statements to the police subsequent to his arrest should have been suppressed as fruits of the illegal arrest. *Page 11 
Consequently, he contends, his trial counsel was ineffective for not filing a motion to suppress these statements.
 {¶ 27} The Fourth Amendment to the United States Constitution, made applicable to the states by its incorporation into theFourteenth Amendment, provides that people are "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures * * * and no Warrants shall issue, but upon probable cause * * *."
 {¶ 28} An arrest without a warrant is constitutionally invalid unless the arresting officer had probable cause to make the arrest. The test for probable cause to justify an arrest is "whether at that moment the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91, 13 L.Ed.2d 142,85 S.Ct. 223. (Emphasis added). Whether a Fourth Amendment violation has occurred "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time."Scott v. United States (1978), 436 U.S. 128, 136, 98 S.Ct. 1717,56 L.Ed.2d 168.
 {¶ 29} The probable cause test requires more than a generalized suspicion of criminal conduct, although less certainty than proof beyond a reasonable doubt. State v. Watson (Apr. 27, 1995), Cuyahoga App. No. 67396. Probable cause must exist at the time of the arrest; it cannot be established later by evidence gathered from the *Page 12 
suspect after his illegal arrest. Beck, supra.
 {¶ 30} Because the police did not know whether the gunman was still in the store, we find nothing improper in their drawing their guns and ordering Gooden to the ground when he emerged from the back storage area of the store and began walking to the front of the store. In light of the facts and circumstances known to the police at the time of Gooden's arrest, we find there was no probable cause to arrest him and take him to the police station.[1]
 {¶ 31} At the time of Gooden's arrest, the police knew only that: 1) Kristen and Gooden were the two CVS employees who had been present in the store when it was robbed; 2) Kristen had been tied up during the robbery, but Gooden had not; 3) Gooden had come walking out of the back storage area of the store, headed toward the front of the store, while the police were searching the store; and 4) Gooden was not answering questions the police put to him about the robbery to their satisfaction. The police had not viewed the video surveillance tapes prior to arresting Gooden.
 {¶ 32} These facts do not give rise to probable cause to arrest. At the least, *Page 13 
Gooden's actions were consistent with those of a victim of an armed robbery. At best, they established only "a generalized suspicion of criminal conduct," which is clearly insufficient for a warrantless arrest. Watson, supra. "It is axiomatic that warrantless arrests must stand on firmer ground than mere suspicion." State v. Newell (1990),68 Ohio App.3d 623, 626, citing Wong Sun v. United States (1963),371 U.S. 471, 479, 83 S.Ct. 407, 9 L.Ed.2d 441. Because mere suspicion that a crime has been committed does not rise to the level of probable cause, we find Gooden's arrest unlawful.
 {¶ 33} Incriminating statements stemming from unreasonable searches and seizures need not always be suppressed as "fruit of the poisonous tree," however. Brown v. Illinois (1975), 422 U.S. 590, 599,95 S.Ct. 2254, 45 L.Ed.2d 416. In Wong Sun, supra, the United States Supreme Court held that the proper inquiry is whether the evidence was obtained through exploitation of the constitutional violation or by means sufficiently attenuated from the constitutional violation so as to purge the evidence of its initial taint. In Brown, supra, the United States Supreme Court set forth three factors for courts to consider in determining whether the causal chain has been sufficiently attenuated: "[the] temporal proximity of the arrest and the confession, the presence of intervening circumstances, * * * and, particularly, the purpose and flagrancy of the official misconduct." Id. at 603-604 (citations omitted). The question of whether a confession has been tainted by an illegal arrest must be decided on the facts of each case; no single factor is dispositive. Id. The burden of *Page 14 
showing admissibility rests with the prosecution. Brown, supra. See, also State v. Davis (Jan. 31, 1994), Brown App. No. CA93-06-007.
 {¶ 34} In this case, we find no intervening circumstances sufficient to break the causal connection between Gooden's illegal arrest and his oral and written statements. Although the officers gave GoodenMiranda warnings before he was questioned, Miranda warnings alone are insufficient to dissipate the taint of an illegal arrest and detention from a subsequent confession. Brown, supra; see, also, Dunaway v. NewYork (1979), 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824. Furthermore, we do not find the fact that Gooden's written statements were given on August 24, 2005, three days after he was arrested, sufficient to break the causal chain. As the United States Supreme Court recognized in Dunaway, supra, the "temporal relationship between the arrest and the confession may be an ambiguous factor," because a lengthy detention can be used to exploit an illegal arrest at least as easily as a brief detention. 442 U.S. at 220.
 {¶ 35} With respect to the purpose of the official misconduct, it is apparent that the police arrested Gooden without probable cause as an investigatory tactic to gather evidence against him. They arrested him in the early morning hours of August 20, 2005, brought him to the police station, and then questioned him three separate times over the next several hours. He was not charged until August 23, 2005.
 {¶ 36} "[W]hen police purposely effect an illegal arrest or detention in the hope that custodial interrogation will yield incriminating statements, the deterrence rationale *Page 15 
for application of the exclusionary rule is especially compelling." United States v. Crawford (C.A. 9, 2004), 372 F.3d 1048, 1093. See, also, Brown, 422 U.S. at 605 (finding taint of illegal arrest not attenuated when "the arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up.")
 {¶ 37} "We are not entirely callous to the policeman's dilemma when trying to solve crimes. * * * The detectives who investigated the case are seasoned veterans and have doubtlessly developed certain `instincts' about crime solving and criminals. Perhaps they are able to sense that a suspect is lying or is involved in a crime. Nevertheless, the rights guaranteed by the Fourth Amendment are fundamental to the American way of life and have `roots that are deep in our history.' TheFourth Amendment forbids the police from arresting someone because they feel that person is involved in a crime. Probable cause is required, not suspicion." State v. Novosel (Sept. 7, 1983), Mahoning App. No. 82 C.A. 93 (citation omitted).
 {¶ 38} Despite Gooden's warrantless arrest, we find no error in defense counsel's failure to challenge his subsequent oral and written statements to the police. In evaluating a claim of ineffective assistance of counsel, a court must be mindful that there are countless ways for an attorney to provide effective assistance in a given case and it must give great deference to counsel's performance.Strickland, supra at 689. Trial tactics and strategies do not constitute a denial of effective assistance of counsel. State v. Clayton (1980), 62 Ohio St.2d 45, 49. *Page 16 
 {¶ 39} Here, as discussed below, we find nothing inculpatory about Gooden's oral or written statements to the police after his arrest and, therefore, find no reason why counsel should have attempted to have them suppressed. Moreover, it was in Gooden's interest to have the statements admitted to show that his account of what happened during the robbery was consistent Kristin's statement, her testimony and the videotape. Accordingly, it was not ineffective for counsel not to file a motion to suppress the statements.
 {¶ 40} Appellant's third assignment of error is overruled.
 {¶ 41} In his fourth assignment of error, Gooden argues that the trial court erred in denying his Crim.R. 29(A) motion for acquittal because the evidence was insufficient to support his convictions. We agree.
 {¶ 42} Crim.R. 29(A) provides for a judgment of acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses." An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 43} The State's theory of the case was that Gooden conspired with and/or *Page 17 
aided and abetted the masked gunman in the robbery, kidnapping and other offenses. R.C. 2923.03(A) provides:
 {¶ 44} "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
 {¶ 45} "* * *
 {¶ 46} "(2) Aid or abet another in committing the offense;
 {¶ 47} "(3) Conspire with another to commit the offense * * *."
 {¶ 48} Mere presence at the scene is not enough to convict of conspiracy or aiding and abetting; there must be sufficient proof that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime and that he shared the criminal intent of the principal. See, e.g., In re T.K.,109 Ohio St.3d 512, 2006-Ohio-3056, at |514; State v. Johnson,93 Ohio St.3d 240, 2001-Ohio-1336, syllabus; State v. Jordan,168 Ohio App.3d 202, 2006-Ohio-538, at 4|8.
 {¶ 49} In this case, the State's evidence against Gooden was insufficient to establish either that he conspired with and/or aided and abetted the robber or that he shared his criminal intent.
 {¶ 50} Gooden's first statement (obtained after an illegal arrest, as discussed above), contains nothing inculpatory and is, in fact, entirely consistent with both Kristen's testimony at trial and the videotapes. Likewise, there is nothing in Gooden's second statement that suggests he was involved in the robbery. Although *Page 18 
Gooden states that the robber may have been a male named Davion Burton, there is nothing in the second statement to support the prosecutor's assertion at oral argument that the statement contains Gooden's "confession" that he was involved in the robbery and an admission that he would "get a cut" from the robbery. The only support for the prosecutor's outlandish assertion is the testimony of Detective Duffy at trial that his interpretation of Burton's statement to Gooden that "I'm gone have to rob y a `ll, come up in the[re] with my gun and make a killing, but don't worry I got you," was that Gooden would get a cut from the robbery. There is no evidence anywhere in the record, however, that validates this assumption or interpretation.
 {¶ 51} As with Gooden's statements, there is nothing in the videotape that is inconsistent with Gooden's assertion that he was a victim of the robbery, and not an active participant in the crimes. In fact, the videotape is entirely consistent with Gooden's written statement regarding what happened that night; it reveals a young male doing exactly what he has been told to do as quickly as possible so that the gunman will leave.
 {¶ 52} The testimony at trial is equally insufficient to support Gooden's convictions. As testified to by Friedman, the store's manager, CVS store policy, on which employees are trained, is that employees should comply with a robber's demands to protect their own safety. According to Kristen, Gooden did as the gunman instructed, and as she would have expected based on store policy, and there *Page 19 
was nothing about his behavior that suggested he was involved in the robbery.
 {¶ 53} Detective Gerl's testimony, based only on his opinion that Gooden did not give "adequate responses" to his questions, is likewise insufficient evidence to establish guilt. Moreover, that Gooden did not try to stop the crimes in progress, despite store policy (as Gerl obviously thinks he should have), does not establish that he was an active participant in the crimes and that he shared the gunman's criminal intent.
 {¶ 54} The evidence presented by the State in this case established that, in the opinion of the investigating detective, Gooden had a "nonchalant" attitude when first approached, gave "unsatisfactory" answers to police questions (no specificity exists as to this allegation in the record), and did not resist or attempt to escape from the robbery when, in the opinion of the detective, he could or should have.
 {¶ 55} Appellant's fourth assignment of error is sustained. The trial court's judgment finding appellant guilty is reversed, and this matter is remanded with instructions to the trial court to vacate appellant's convictions and discharge him with respect to these convictions.
 {¶ 56} Our resolution of appellant's fourth assignment of error renders his first, second, and fifth assignments of error moot and therefore we need not consider them. See App.R. 12(A)(1)(c).
Reversed and remanded.
 It is ordered that appellant recover from appellee costs herein taxed. *Page 20 
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. Case remanded to the trial court.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
[1] The transcript of proceedings from the Lyndhurst Municipal Court states that on August 23, 2005, Gooden was "arrested on a warrant founded on an affidavit" by Detective Gerl. Gooden was clearly arrested without a warrant, however, in the early morning hours of August 21, 2005, when he was taken to the police station for questioning and then held, without being charged, until August 23, 2005. A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, "taking into account all of the circumstances surrounding the encounter, the police conduct would `have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" Florida v. Bostick, 501 U.S. 429, 437,111 S.Ct. 2382, 115 L.Ed.2d 389, quoting Michigan v. Chesternut (1988),486 U.S. 567, 569, 108 S.Ct. 1975, 100 L.Ed.2d 565.