[Cite as *State v. Deuble*, 2020-Ohio-3970.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                           :

    Plaintiff-Appellee,          :

                                                    No. 108814

    v.                                       :

DANIEL DEUBLE,                          :

    Defendant-Appellant.        :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** August 6, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-632279-A

---

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Melissa Riley, Assistant Prosecuting
Attorney, *for appellee*.

Henderson, Mokhtari & Weatherly and Justin Weatherly,
*for appellant*.

PATRICIA ANN BLACKMON, J.:

{¶ 1} Daniel Deuble ("Deuble") appeals from his convictions of attempted unlawful sexual conduct with a minor, importuning, disseminating matter harmful

to juveniles, and possessing criminal tools and assigns the following error for our review:

    I.      The trial court erred in denying appellant's motion to suppress when it found that appellant's arrest was predicated on probable cause.

{¶ 2} Upon review, we find that the police did not have probable cause to arrest Deuble without a warrant, and any evidence obtained following his arrest, including information on his cell phone and his confession, should have been suppressed. Accordingly, we reverse the trial court's judgment. The apposite facts follow.

**Facts and Procedural History**

{¶ 3} On August 30, 2018, special investigators with the Cuyahoga County Prosecutor's Office Internet Crimes Against Children Task Force ("ICAC") set up an undercover operation looking for individuals who were seeking to engage in sexual activity with minors. An undercover investigator posed as a 15-year-old girl using the social media application "Whisper." An individual using the moniker "EY" began instant messaging with the investigator, and the conversation was sexual in nature. The two arranged to meet in a local park the next day, August 31, 2018, for a sexual encounter. At the meeting place, police officers saw Deuble checking his cell phone, approached and handcuffed him, and searched his phone. This search revealed that Deuble was, in fact, EY.

{¶ 4} On September 12, 2018, the grand jury indicted Deuble for one count of attempted unlawful sexual conduct with a minor in violation of R.C. 2923.02 and

2907.04(A), one count of importuning in violation of R.C. 2907.07(D)(2), one count of disseminating matter harmful to juveniles in violation of R.C. 2907.31(A)(1), and one count of possessing criminal tools in violation R.C. 2923.24(A).

{¶ 5} Deuble pled not guilty to the charges and, on December 17, 2018, filed a motion to suppress, arguing ICAC officers lacked probable cause to arrest him. The trial court found the ICAC investigators and Parma Heights police had probable cause to arrest Deuble and denied the motion to suppress evidence. Deuble subsequently pled no contest to the charges in the indictment. The court sentenced him to 40 days in the Cuyahoga County jail and ordered him to serve two years of community control on each of the four counts in the indictment. Finally, the court classified him as a Tier II sex offender. This appeal followed.

**Hearing Testimony**

{¶ 6} The following testimony was presented at a hearing on the motion to suppress:

{¶ 7} Justin Rotili ("Rotili") testified that he is a special investigator for ICAC. On August 30, 2018, Rotili posted a message on a popular social media application known as Whisper to find individuals seeking to have sex with minor children. Whisper allows users to remain anonymous and utilizes the location of an individual's device to interact with people nearby. Posing as a 15-year-old girl named "bella_jane," Rotili posted a picture of an adolescent girl on a pier with a message that read "BORED!!!" EY responded and identified himself as an 18-year old "hung white guy." Rotili, continuing to pose as "bella_jane," responded "LOL

what?" EY clarified and asked if "bella_jane" liked "white men with big dicks." A series of messages between Rotili and EY ensued, and the entire conversation was admitted into evidence as State's exhibit No. 1.

{¶ 8} Rotili identified himself as a 15-year-old girl early in the conversation. Despite this information, EY sent "bella_jane" photographs of his penis and asked if "bella_jane" would like to see his "nine inches." Rotili sent photographs of a teenage girl, whom he represented as his online persona. EY replied with a message and an emoticon of a purple devil that read: "I'd stretch your tight little virgin pussy wide." Thereafter, EY sent two photographs of his erect penis, one next to a Rubik's Cube and the other photograph with a Post-It note on his penis with the name Bella and a hand-drawn picture of cat on it. The conversation ended for the night when EY made plans to meet "Bella" at her home the following morning when her parents were not around.

{¶ 9} The conversation resumed the next morning. EY asked "Bella" if she was still "okay with me coming over, us making out, me eating your pussy out, sucking my cock, and then losing your virginity." Rotili, maintaining the identity of "bella_jane," responded in the affirmative and suggested that she meet him first at Kurtz Park in Parma Heights, which was located near her house, so that his car would not be observed in her driveway.

{¶ 10} EY informed "Bella" that he would arrive shortly before 10:00 a.m. Undercover ICAC investigators and Parma Heights police began surveilling Kurtz Park at approximately 9:00 a.m. EY sent a message to "bella_jane" informing her

that he observed the police when he arrived at the park and asked if he should return later. "[B]ella_jane" responded, "yes, please!!!," and EY agreed to return to the park around 11:00 a.m. EY later sent an instant message that he was at the park.

{¶ 11} EY told "bella_jane" that he drove a green Honda. Officer Rotili testified that after he received the message that EY was at the park, he began looking for him but did not have a detailed description of EY's physical appearance other than that he was a thin white male. Rotili further stated that he did not observe a green Honda as expected, but he saw two white males on the basketball court. The younger looking white male, later identified as Deuble, looked at his phone every time EY sent or received messages from "bella_jane." Rotili explained:

> I had noticed one of the — the defendant would stop playing basketball, walk over to his phone, and I would get a response immediately after. And I picked that up and so I sent a couple of more text messages. And every time the suspect would put his phone down[,] I received a text message from him. That's when I knew that [he] was going to be our person.

{¶ 12} Having identified Deuble as using his cell phone at the same time as EY, officers moved in and handcuffed him. Officer Rotili picked Deuble's phone up off the ground and sent a test message to verify that Deuble was the individual he had been corresponding with. The "test" message went through to Deuble's phone and confirmed that he was the person planning to meet "bella_jane" at the park. Meanwhile, another officer retrieved his wallet and state identification card from his vehicle, which was nearby. After confirming Deuble's identity, the officers escorted him to a police vehicle where he was advised of his *Miranda* rights. Rotili informed

Deuble that the doors to the vehicle were unlocked and that he was free to leave if he did not want to talk with police. Deuble indicated that he understood his rights and admitted that he had come to Kurtz Park for the purpose of having sex with a 15-year-old girl.

## Law and Analysis

{¶ 13} In his sole assigned error, Deuble argues the trial court erred in denying his motion to suppress. He contends that the ICAC investigators and Parma Heights police lacked probable cause to arrest him without a warrant and that any evidence obtained following his arrest, including his confession, should have been suppressed.

{¶ 14} In *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, the Ohio Supreme Court set forth the standard of review of a ruling on a motion to suppress as follows:

> Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Fanning* (1982), 1 Ohio St.3d 19, 1 OBR 57, 437 N.E.2d 583. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard. *State v. McNamara* (1997), 124 Ohio App.3d 706, 707 N.E.2d 539.

*Id.* at ¶ 8.

{¶ 15} The Fourth Amendment to the United States Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Ohio Constitution, Article I, Section 14, is nearly identical to its federal counterpart. *State v. Kinney*, 83 Ohio St.3d 85, 87, 1998-Ohio-425, 698 N.E.2d 49.

{¶ 16} The warrant requirement, however, is subject to a few specifically established and well-delineated exceptions. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). "An arrest without a warrant is constitutionally invalid unless the arresting officer had probable cause to make the arrest." *State v. Werber*, 8th Dist. Cuyahoga No. 93716, 2010-Ohio-4883, ¶ 36. The standard for probable cause to justify an arrest is "whether at that moment the facts and circumstances within [the officer's] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

{¶ 17} This court has held that "[p]robable cause requires more than a generalized suspicion of criminal conduct, although less certainty than proof beyond a reasonable doubt. Probable cause must exist at the time of the arrest; it cannot be established later by evidence gathered from the suspect after his illegal arrest." (Citations omitted.) *Werber* at ¶ 37.

{¶ 18} Deuble contends he was illegally arrested as soon as officers handcuffed him because the police lacked both probable cause and a warrant to arrest him. The state argues, however, that Deuble was not under arrest when he was handcuffed and that they were authorized to detain him for investigatory purposes under *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967).

{¶ 19} In the journal entry denying Deuble's motion to suppress, the trial court found that "[c]onsidering all the evidence here, the initial seizure of Deuble was an arrest." The trial court based this finding on video from one of the officer's body cams showing, and officer testimony explaining, that Deuble was placed in handcuffs, sat on the ground, and surrounded by multiple police officers. This court must accept this factual finding if it is supported by competent and credible evidence in the record.

{¶ 20} The trial court synopsized the evidence presented at the hearing concerning Deuble's detainment as follows:

> Video from Rotilli's [sic] body worn camera shows that Deuble was approached from the right side of the basketball court by one officer as Rotilli came from the left. He was not handcuffed as he was asked to put down the basketball and then escorted over a grassy area to where his car was parked. He was, however, standing and handcuffed while next to his car as several officers waited for Rotilli, who had retrieved Dueble's phone from the ground near the basketball hoop. Deuble was then seated on a grassy area near the parking lot curb as Rotilli questioned him.
> Deuble was first asked for his ID and told the police it was in his bag on the front seat of his car. Investigator David Frattare got Deuble's wallet but did not otherwise search the car at that point. In the meantime, Rotilli sent a test message on Whisper which pinged a notification on Deuble's phone, thereby confirming that Deuble was the other party to the chat with Bella.

The officers then confirmed Deuble's name, age and address and asked what he was doing at the park. * * * The whole time Deuble was surrounded by at least four other law enforcement officers. Finally, Deuble asked "What's going on?" and Rotilli said: ["]Here's what we're gonna do. We have a truck over there. It's got an interview room in the back. It's gonna be air conditioned, it'll be a little bit more private. I'd like to sit down and talk to you real quick, explain to you what's going on. How's that sound?["].

Deuble replied "sure" and was escorted across the parking lot to the interview truck. His handcuffs were removed while outside of the truck and then he went in to begin his interview. The entire initial encounter — from the time he was approached on the basketball court to the time the handcuffs were removed — lasted less than six minutes.

{¶ 21} Rotili testified that Deuble was handcuffed for the following reasons: "Just temporary detainment so we can further our investigation. Officer safety." However, there is no evidence supporting a belief that officer safety was a heightened concern in the case at hand. Furthermore, the following colloquy occurred between the court and the state's witness, special investigator David Frattare ("Frattare"):

THE COURT: Let's say that Mr. Deuble had declined a statement, didn't give you any further information from the time he was on the ground there where we just saw. Based on what you know you would have arrested him anyway, correct?

THE WITNESS: I think after we had identified who he was, where he was from, and also the test message that we sent to his phone, I think at that point we had a pretty good idea we were going to.

THE COURT: That's what I was going to.

At least through the test message, regardless of what he told you or didn't tell you, if he chose not to make a statement in the ensuing hour or so, he was going to be arrested? You felt you had probable cause to believe that he committed on or more of the crimes with which he was ultimately charged?

THE WITNESS: After we saw the message on the phone and the ID, yes.

{¶ 22} Frattare further testified that the message in question "was probably sent while [Deuble] was on the ground. I think it occurred maybe as he was going to the van, if I'm remembering that." Asked if this message was "sent once the person is, well arrested or detained," Frattare answered, "Yes." Frattare also testified that, after Deuble was handcuffed, Rotili told Deuble the police were going to take him to the van to interview him. At that point, Deuble was led in handcuffs to the van.

{¶ 23} In *Cleveland v. Morales*, 8th Dist. Cuyahoga No. 81083, 2002-Ohio 5862, ¶ 15, this court reversed a trial court's denial of the defendant's motion to suppress, finding that "it is abundantly clear that the appellant's freedom was deprived to an extent sufficient to create a 'custodial interrogation.'"

> In questioning the appellant, Officer Gulas handcuffed him and restricted his freedom of movement. In being handcuffed and isolated, there is no question that the appellant considered his freedom of movement to be restricted. Further, the appellant was restricted to a single room in his girlfriend's house. Moreover, the fact that the officer refused to allow the appellant to leave the room prior to being questioned further exacerbated the appellant's belief that he was not free to leave. Last, we note that there are situations where officer safety is of concern and the handcuffing of a suspect may be warranted, but this matter fails to reach that level since the appellant was not armed, nor did he pose a threat to the responding officers.

*Id.*

{¶ 24} Upon review, we agree with the trial court that Deuble was arrested. Deuble was handcuffed, seated on the ground, and surrounded by four or more police officers. Rotili picked up Deuble's phone, which was on the ground, and

searched it. The officers then walked Deuble, who was still handcuffed, to the van. A reasonable person would not feel free to leave under these circumstances. Therefore, this appeal is concerned with probable cause, and the standard of reasonable suspicion associated with a *Terry* stop is not applicable here. *See United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) ("a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave").

{¶ 25} The next step an appellate court must take in reviewing a motion to suppress is to determine, de novo, whether the facts satisfy the applicable legal standard. The trial court in the case at hand determined that "[s]ince Deuble's detention amounted to an arrest, it was only lawful if supported by probable cause." The trial court analogized this case to *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983):

> This case bears some resemblance to situations where police receive anonymous tips that a crime is being committed. Typically, an anonymous tip by itself will not support a finding of probable cause; instead, the totality of circumstances, including the tip, must be examined to determine whether probable cause exists. * * * In essence, Rotilli was tipped that a young adult man was going to Kurtz Park that Friday morning to meet an underage girl for sex. The tip was corroborated by circumstances when Deuble showed up at around the appointed time and was seen using his phone at the same time the unknown suspect was communicating with the girl over a cell phone app.

{¶ 26} On appeal, Deuble is challenging the search of his cell phone. In *State v. Smith*, 124 Ohio St.3d 163, 2009-Ohio-6426, 920 N.E.2d 949, ¶ 24, the Ohio

Supreme Court held that "because an individual has a privacy interest in the contents of a cell phone that goes beyond the privacy interest in an address book or pager, an officer may not conduct a search of a cell phone's contents incident to a lawful arrest without first obtaining a warrant." The Ohio Supreme Court rephrased its holding in the same opinion: "We hold that the warrantless search of data within a cell phone seized incident to a lawful arrest is prohibited by the Fourth Amendment when the search is unnecessary for the safety of law-enforcement officers and there are no exigent circumstances." *Id.* at ¶ 29.

{¶ 27} The evidence in the instant case shows that the suspect initially agreed to meet at Kurtz Park at 10:00 a.m. on August 31, 2018. The meeting time was later changed to 11:00 a.m. The suspect described himself as a thin white male, 21-25 years old, driving a green Honda. At approximately 11:00 a.m., the suspect sent a message, via the Whisper app, that he had arrived at the park.

{¶ 28} The investigating officers never saw a green Honda, but observed a young white male playing basketball at the park and an older white male separately playing basketball at the park. The officers did not see the older male use a cell phone during this time; however, they did see the younger male "picking up his phone texting, corresponding with our — as our undercover texts we start to see a correspondence with the individual that's on the basketball court picking up his phone and replying or text messaging his own."

{¶ 29} After observing Deuble check his phone three times, the officers handcuff him with his arms behind his back, sit him on the ground, and surround

him.  It was not until after Deuble's arrest that the officers sent a "test" message to the suspect's phone to confirm whether it was, indeed, Deuble's phone.  In fact, Rotili testified as follows: "When I picked [Deuble's] phone up he was already in handcuffs."  He further testified that it was not until the test message was received on Deuble's phone that the police had probable cause to arrest Deuble.

{¶ 30} Upon review, we find that the probable cause did not occur until after the police arrested Deuble.  Prior to Deuble's arrest, the police knew that he was present at the meeting place, and he was using a cell phone at the same time the suspect was using a cell phone.  He matched the suspect's description, but that description was vague, indicating race, gender, a "thin" build, and approximate age.  Furthermore, there was no sign of the green Honda the suspect was purportedly driving.

{¶ 31} As the trial court noted in its journal entry denying Deuble's motion to dismiss, the "totality of circumstances" prior to Deuble's arrest consisted of him showing up at the meeting place and using his phone.  The totality of the circumstances test, set forth in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), does not give the police the authority to arrest a person and then search that person's phone for probable cause to support the arrest.  *See, e.g., State v. Gooden*, 8th Dist. Cuyahoga No. 88174, 2007-Ohio-2371, ¶ 29 ("Probable cause must exist at the time of the arrest; it cannot be established later by evidence gathered from the suspect after his illegal arrest").

{¶ 32} Similar to the Ohio Supreme Court's holding in *Smith*, the United States Supreme Court determined that cell phone owners have a heightened privacy interest in the data stored on their devices.

> Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans "the privacies of life," [*Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886)]. The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought. Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple — get a warrant.

*Riley v. California*, 573 U.S. 373, 403, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014).

{¶ 33} The court erred by denying Deuble's motion to suppress, and his sole assigned error is sustained.

{¶ 34} Judgment reversed and case remanded for further proceedings consistent with this opinion.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
PATRICIA ANN BLACKMON, JUDGE

KATHLEEN ANN KEOUGH, J., CONCURS;
EILEEN T. GALLAGHER, A.J., DISSENTS
WITH SEPARATE OPINION

EILEEN T. GALLAGHER, A.J., DISSENTING:

{¶ 35} I respectfully dissent because I believe the officers had probable cause to arrest Deuble, and I would affirm the trial court's judgment.

{¶ 36} A warrantless arrest is constitutionally valid if, at the time of the arrest, the facts and circumstances within the officer's knowledge were sufficient to warrant a prudent person to believe that the suspect had committed an offense. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). A warrantless arrest does not require the officer's absolute knowledge that a crime has been committed; it requires only a reasonable belief based on the totality of the circumstances. *State v. Timson*, 38 Ohio St.2d 122, 127, 311 N.E.2d 16 (1974).

{¶ 37} Probable cause is a common-sense standard that requires only showing that a probability, rather than an actual showing, that criminal activity existed. *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In other words, probable cause does not require conclusive proof of guilt beyond a reasonable doubt;

it merely requires facts establishing "that it is more likely than not that a defendant is committing or has committed a crime." *State v. Oloye*, 10th Dist. Franklin No. 17AP-902, 2018-Ohio-3182, ¶ 9.

{¶ 38} Although the officers did not have a detailed description of Deuble's physical appearance, they knew he was a young, thin, white male. There were only two white males at the park at the time EY indicated that he was there to meet "bella_jane." The officers sent several text messages to EY and watched to see which of the two white males would respond in order to correctly identify the perpetrator. Officer Rotili testified that Deuble picked up his phone every time Rotili sent him a message under the guise of "bella_jane," and Rotili received a response to his text messages as soon as Deuble put his phone back down. After repeating this test several times, Rotili concluded: "That's when I knew that [he] was going to be our person." (Tr. 138.)

{¶ 39} I believe these facts established that the man responding to Officer Rotili's text messages was more likely than not the individual planning to have sex with an underage girl. Therefore, I believe the officers had probable cause to arrest Deuble under these circumstances, and I would affirm the trial court's judgment.