[Cite as *State v. Garcia*, 2016-Ohio-585.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 102546

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## TIMOTHY GARCIA

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-13-573321-B

BEFORE:    McCormack, J., Jones, A.J., and Boyle, J.

RELEASED AND JOURNALIZED:    February 18, 2016

**ATTORNEYS FOR APPELLANT**

Fernando Mack
1220 West 6th Street
203 The Bradley Building
Cleveland, Ohio 44113

Edward F. Borkowski, Jr.
P.O. Box 609151
Cleveland, Ohio 44109


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY: Kelly N. Mason
Assistant County Prosecutor
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

TIM McCORMACK, J.:

{¶1}    On New Year's Eve 2012, Angel Strong arranged a drug sale for Ronnie Butcher. Two men showed up but, instead of selling drugs to Butcher, they assaulted and robbed him with a gun. Strong subsequently identified Timothy Garcia as one of the two assailants. Garcia pleaded not guilty. After a lengthy jury trial, Garcia was found guilty. Upon a careful review of the record and applicable law, we affirm his conviction.

{¶2}    At trial, the state presented five witnesses in its case in chief and one rebuttal witness. The state's key witness was Angel Strong, who described the robbery as "a drug deal that went bad." She arranged the drug deal with her drug dealer "Ray" for Ronnie Butcher. Ray did not show up for the transaction, instead, Ray's father and another man Strong only knew as "Pito" showed up to rob Ronnie Butcher. The state presented testimony from its witnesses to show that Pito was Ray's cousin, defendant Timothy Garcia. The state indicted both Strong and Garcia for the robbery. Strong was cooperating with the police even before the indictment and eventually took a plea bargain from the state. Ray's father was never indicted, because the victim, Ronnie Butcher, was unable to identify him from a photo array; Ray's father died in a car accident before the trial took place.

{¶3}    The defense presented three witnesses — Garcia's sister, his mother, and his cousin Jeffery Perez — who provided an alibi and testified that Garcia was in his house on New Year's Eve.

{¶4} We begin our review with a summary of the testimony of the state's three main witnesses: the victim Ronnie Butcher, Angel Strong, and Det. William Gonzalez, who investigated this case.

**I. Victim Ronnie Butcher's Testimony**

{¶5}    Butcher, the robbery victim, was addicted to Percocet that he traced to a back injury.   On New Year's Eve, he called his friend Brandy Burriss to help him buy a large quantity of Percocet pills.   Burriss contacted Angel Strong.   Strong indicated her drug dealer could sell Butcher 180 Percocet pills at $7 apiece.

{¶6}    Around noon, Butcher and his friend Burriss went to Angel Strong's mother's house, where both Angel Strong and her mother lived at the time, to wait for the dealer.   Ten or 15 minutes later, there was a knock at the door and Angel Strong opened the door.   Two men came in.   The first man made eye contact with Butcher, said "what's up?" and immediately pulled a black 9 mm gun.   He pointed the gun at Burriss and told her to face the wall.   The second man began beating Butcher with his fists, and he covered Butcher's face with the hood of Butcher's jacket, to avoid being seen.   The first man demanded money from Butcher, saying "Give me money or I'm going to kill you.   I'm going to kill her [Burriss].   Where's the money at?   Where's your phone at?"   Butcher threw the $1,200 he had with him and his cell phone on the floor.   The first man then shuffled through Butcher's pocket, and hit him in the head with his gun, while the second man continued beating him.   After the robbery, the two men quickly left the house.

{¶7} Butcher, in a daze, asked Angel Strong what just happened.   Strong was evasive, saying "it wasn't supposed to happen like that."   She said the two men were "Big Pito" and "Little Pito," but gave Butcher conflicting information about who they were.

{¶8}    Butcher went to the police the next day to report the robbery.   He told the police he would be able to identify the first man — because the man had looked him in the eyes — but not the second man.   He described the first man as "six foot something" and "200 pounds."   He also told the police that although the two men were Big Pito and Little Pito, they did not appear

to be father and son from the way they talked to each other during the robbery. Both men had a Spanish accent. Butcher also told the police he felt Angel Strong was involved in the robbery.

{¶9} Butcher testified that he identified defendant Timothy Garcia from a photo lineup as the first man — the man who assaulted and robbed him with a gun — but with only 50 percent certainty. He identified Garcia in court as the first assailant, however, with 100 percent certainty.

{¶10} Butcher's testimony also revealed that only a few days before the New Year's Eve robbery, he had also bought Percocet through Brandy Burriss and Angel Strong. On that occasion, he bought the drug from a dealer Strong referred to as Ray, who happened to have a cast on his arm. Butcher testified that Ray was not one of the two men who robbed him on New Year's Eve.

{¶11} Butcher also testified that he had been threatened at a barber shop by a friend of Garcia, who warned him not to testify.

## II. Angel Strong's Testimony

{¶12} Angel Strong provided the most specific and incriminating testimony against the defendant. Strong acknowledged that she used to be a heroin addict. In exchange for heroin or money, she would help set up drug transactions for her dealer Ray. On New Year's Eve, when her friend Brandy Burriss called her to arrange a sale of Percocet pills for Ronnie Butcher, she called Ray. The drug sale was to take place in Strong's mother's house.

{¶13} While Strong, Burriss, and Butcher waited in the house, Strong talked over the phone with Ray, who indicated that his father would be delivering the Percocet pills soon. Ten minutes later, however, someone whom she knew only as Pito walked through the door with a gun, followed by Ray's father. After robbing Butcher with a gun, the two men ran out of the

house. A 911 call was made later to report the armed robbery. Strong did not remember whether she or her mother made the 911 call.

{¶14} Strong's recollection of certain details of the robbery differed somewhat from Butcher's. While Butcher testified there was a knock on the door and Strong opened the door, Strong testified the two men walked in without knocking. Butcher testified only the first man had a gun; Strong testified both men carried a gun.

{¶15} Strong testified that she knew the two men from past drug deals. The first man into the house was Pito, and the second man was Ray's father. When she bought drugs from Ray in the past, either Ray's father or Pito would be in the vehicle with Ray. Strong estimated she had seen Pito 15 or 20 times before the night of the robbery. She thought Pito was Ray's cousin. Strong identified defendant Timothy Garcia in court as the man she knew as Pito.

{¶16} Consistent with Butcher's testimony, Strong also revealed that, only days before the robbery incident, she had arranged a sale of Percocet pills between Ray and Butcher. Apparently Ray was not a complete stranger to Butcher. Strong testified that, when Butcher saw Ray on that occasion, Butcher appeared to recognize Ray as someone he had seen in the past.

{¶17} A few days after the New Year's Eve robbery incident, Strong was contacted by Det. Gonzalez of the Cleveland police department. Strong testified that she initially did not provide a truthful account of what had occurred, for fear her mother would throw her out of the house. On her mother's advice to "come clean," Strong was subsequently willing to cooperate with the police. She, however, only knew the two men by their street names. She knew the first man as Pito and the second man — Ray's father — as Big Pito.

{¶18} Somewhat fortuitously, Pito suddenly showed up on her Facebook page as one of the "People You May Know." Pito was suggested on her Facebook page as a "friend"

apparently because she was a "friend" on Facebook with Ray's girlfriend, who in turn was a "friend" on Facebook with Pito. Pito was on Facebook under the name "Pistol Papa Pete." Now having a picture of his face besides his street name, Strong went to the police to help identify Pito. At the police station, she pulled up her Facebook page on a police computer and showed Det. Gonzalez Pito's profile page. Strong helped the detective retrieve several pictures of Pito in various poses from his Facebook page.

{¶19} Strong acknowledged her past heroin addiction, but testified that she has been sober for about a year and a half. She also acknowledged that she herself was indicted for the instant robbery with defendant Garcia, but took a plea bargain from the state. Under the plea bargain, she pleaded to robbery, an F-4 offense, and received two years of community control sanctions, in exchange for testifying truthfully in this case. Strong testified that she did not know Ray's father was coming to the house to rob Butcher. She pleaded guilty because she felt responsible for having set up the drug deal. She testified that, although initially reluctant, she began to cooperate with the police at the urging of her mother a month after the incident, long before she was indicted and pleaded guilty under the plea bargain.

{¶20} Strong also testified that she had received an anonymous, threatening phone call telling her not to testify in this case. In addition, she testified that Ray's father, the second man in the robbery, died in a car accident subsequent to the robbery.

### III. Testimony of Det. William Gonzalez

{¶21} Det. Gonzalez testified that around 8 p.m. on New Year's Eve, a 911 call was made by Strong's mother about an incident in her house. Ronnie Butcher reported the robbery the next day. Two males and a female, Angel Strong, were listed as suspects. Angel Strong initially told him that the incident was a random robbery, but then admitted the robbery was "a

drug deal that went bad." She knew the two men from past drug transactions, but only knew their street names, Big Pito and Little Pito.

{¶22} Later, Strong informed Det. Gonzalez that she could help the police identify the first man in the robbery, because he had shown up on her Facebook page. She logged into her Facebook page on a police computer and pulled up the man's profile page, which was under the name Pistol Papa Pete.

{¶23} Pistol Papa Pete's profile page did not show his real name, but it had his birthday and a street name. Det. Gonzalez entered the information into Ohio Law Enforcement Gateway (a police database) and, with further research, was able to find his real name, Timothy Garcia, and also his BMV photo.

{¶24} Strong was also able to use her Facebook to find the profile page of the second man in the robbery, Ray's father. His name was Jose Rodriguez. When the police put together an photo array for both Garcia and Jose Rodriguez and asked the victim Butcher to identify the suspects, Butcher was unable to identify Jose Rodriguez from the photo array, but was able to identify Garcia as the first man in the robbery, with 50 percent certainty.

{¶25} Det. Gonzalez testified that Garcia and Strong were both indicted, and the prosecutor made a proffer to Strong. He testified, however, that Strong had been cooperating with the police at the urging of her mother, long before she was indicted and offered a plea.

{¶26} Det. Gonzalez also testified that Ray was not a suspect in this case because Butcher told him that Ray, who had sold him drugs only days before, was not involved in the robbery.

## IV. Defense Witnesses

{¶27} The defense presented an expert on eyewitness identification, Dr. Dario Rodriguez, to testify regarding factors that may affect the accuracy of eyewitness identification. The trial

court, after conducting a *Daubert* hearing on the expert, permitted the expert to testify extensively about factors that may affect the accuracy of eyewitness identification.

{¶28} In addition, Garcia's sister Christina Galarza, his mother Lydia Perez, and cousin Jeffrey Perez testified on his behalf. All three attempted to provide an alibi for him.

**1. Garcia's Sister**

{¶29} Garcia's sister testified that she and Garcia were at their mother's house during the day on New Year's Eve 2012. Garcia left around 10:30 a.m. to buy ice for a large family gathering of about 50 people later that day, and he returned ten minutes later. He was then cleaning up for the party with some cousins. Garcia then left around 4 p.m. with cousin Jeffrey to go shopping for a new shirt for New Year's Eve.

{¶30} Garcia's sister testified that she has a cousin "Ray Ray." His father was her uncle Raymond. Raymond was "a very bad person." He was incarcerated for 17 years, and returned to the area not long before New Year's Eve 2012. He died in September 2014 when his vehicle hit a telephone pole.

{¶31} Garcia's sister testified her brother and cousin "Ray Ray" were close. "Ray Ray" was at the New Year's Eve party. She testified that "Ray Ray" was on the "straight and narrow" in the past but changed when his father returned from prison.

{¶32} The defense elicited testimony from Timothy Garcia's sister about his character to show that his character was not consistent with being involved in the armed robbery he was charged with. The defense counsel asked her, "Do you know your brother to be in any kind of gang or involved in drug dealing?" She answered "no." The defense counsel also asked, "To your knowledge has your brother ever been involved in anything violent?" She answered "no," and went on to describe him as a quiet guy who kept to himself and was very gentle with younger

members of the family. The defense counsel asked her if she considered her brother to be a violent person. She again answered in the negative. The defense counsel then asked her if she knew him to own a weapon, she answered negatively. She also denied having any association with any drug users or drug dealers, except for acknowledging that her cousin "Ray Ray" was recently arrested for a drug offense.

{¶33} After Garcia's sister again stated on the cross-examination by the state that she did not know Garcia to be a violent person and would be surprised to see him holding a gun, the state introduced exhibit No. 1-A, a picture of Garcia holding a gun, one of the several photographs from his Facebook page under the name Pistol Papa Pete. His sister acknowledged that it was indeed a picture of Garcia, but stated she had never seen the picture before. The state also asked Garcia's sister about his employment. She answered he worked at McDonald's for many years. The state then introduced its exhibit No. 2, which was Garcia displaying a large stack of cash in his hands.

{¶34} The state also introduced exhibit Nos. 3 and 4, which were Garcia making a certain hand sign. Again his sister acknowledged it was Garcia in the pictures but stated she had never seen any of these pictures.

{¶35} Outside the presence of the jury, the state informed the trial court that it intended to later call a rebuttal witness, a Cleveland police detective familiar with gangs, in response to Garcia's sister's testimony. The rebuttal witness would testify that the hand sign was a unique gang sign for a notorious gang active on Cleveland's west side. The defense objected. The trial court allowed the witness on the grounds that the defense brought up the issue of gang affiliation.

{¶36} During the defense counsel's direct examination of Garcia's sister, counsel elicited testimony from her that it would take 15 minutes from the house on West 50th Street, where the

robbery occurred, to her mother's house on West 47th Street. On cross-examination by the state, the state showed Garcia's sister an exhibit, a Google map, which showed that the driving distance between the two houses was only eight minutes. Garcia's sister testified that it would take longer than eight minutes because one of the streets in between had been closed, and there were several lights between the two points.

**2. Garcia's Mother**

{¶37} Garcia's mother, Lydia Perez, also attempted to provide an alibi for her son. She testified that around 10:00 or 10:15 a.m., she asked her son to buy ice for the family gathering of 70 people. He came back in 15 to 20 minutes. She then asked Garcia and his cousins to help clean up the house for the party. It took them about an hour or two for the cleanup. She remembered it was around 2:30 or 3:00 p.m. when her son left the house again.

{¶38} She testified that her son was close to his cousin "Ray Ray," but the relationship changed somewhat after "Ray Ray's" father returned from prison.

{¶39} The defense counsel asked whether her son was involved in a street gang. She answered "no."

{¶40} On cross-examination by the state, Garcia's mother was asked whether anyone in her family had been involved in the use or sale of drugs. She answered that three of them were: she and two brothers of hers. She stated she used drugs 13 or 14 years ago and, before that, she was twice convicted of a felony drug trafficking offense. She acknowledged that her daughter Christina may have known about her drug problem and that her daughter's testimony that no one in the family had been associated with drugs would be inaccurate.

{¶41} After that testimony, the state asked Lydia Perez about her son's drug case in 2012 and his entering an "intervention in lieu of conviction" program under a plea in that case. At

this point, the defense called for a mistrial. The trial court denied the request. The court subsequently instructed the jury that the testimony about the defendant's guilty plea to a drug offense and his entry into a treatment program were for impeachment purposes only, and no inference was to be made from the past drug offense in considering the defendant's guilt in the present case.

### 3. Garcia's Cousin

{¶42} Garcia's cousin, Jeffrey Perez, gave alibi testimony as well. He testified that, on New Year's Eve 2012, he arrived at his aunt's house around 10:00 a.m., and half an hour later, Garcia left to buy some ice. He returned 15 minutes later. He and Garcia then spent an hour cleaning up the house for the party. The two left around 2:30 p.m. to shop for clothing. He testified that from 11:00 a.m. to 2:30 p.m., he and Garcia were both around the house. Garcia played video games somewhere in the house.

{¶43} At one point in Jeffrey Perez's testimony, Perez referred to Garcia as Pito when Perez stated that his (Perez's) father owned a painting business and would occasionally employ himself and Pito, referring to Garcia. This was the first time Garcia was referred to as Pito by family members. Perez's testimony was: "he [referring to Perez's father] primarily works for himself so he would get jobs, and if he needed me or *Pito or Timothy, excuse me*, he would — it would be one of us." When the defense counsel later asked him if he had ever heard of the name Pito, he initially denied it, but later acknowledged that he called his cousin, Timothy Garcia, by his nickname Pito. He explained that Garcia's mother used to call Garcia "Papito" when he was little, and the name stuck with him, but Perez emphasized though that no one outside of the family called him by that name.

### V. The State's Rebuttal Witness

{¶44} After the testimony of the defense witnesses, the state called a rebuttal witness, Det. Todd Staimpel, a detective knowledgeable about the gangs on the west side, specifically the Band Boys Enterprise 900 ("BBE 900"). He testified that the number 900 was a reference to the area of West 90th Street and Madison Avenue, and the gang sign was a symbol for "900." The sign consisted of turning the wrist in a certain angle and holding up three fingers to make an O sign. When shown state's exhibit Nos. 3 and 4, the pictures of Garcia making a hand sign, the detective testified that the hand sign was the unique BBE gang sign. He also testified that there would be retaliation if someone not a gang member posed with the gang sign.

{¶45} Detective Staimpel testified that the BBE members were known to be very active on social media. They would post videos on YouTube and Facebook of rap songs with lyrics depicting violence. It was also common for the gang members to flash the BBE gang sign on Facebook and to post pictures of themselves holding a gun. The gang members robbed, assaulted, and intimidated citizens. Sometimes they would jump on people just walking down the street for no reason. They would then brag about these attacks on Facebook. Detective Staimpel also testified that Garcia's house was in the general geographical territory of the gang.

{¶46} After a lengthy trial, the jury found Garcia guilty of aggravated robbery and the firearm specifications. The trial court sentenced him to six years on the aggravated robbery offense and three years on the firearm specifications, for a total of nine years.

{¶47} On appeal, Garcia raises seven assignments of error for our review.

I:      The trial court erred by permitting the introduction of irrelevant and prejudicial photographs.

II:     The trial court erred by permitting the state to elicit improper impeachment and other acts testimony.

III:    The trial court erred by denying Appellant's motion for a mistrial.

IV: The trial court erred by permitting testimony from the state's rebuttal witness about gangs and gang activity.

V: The trial court erred by denying Appellant's motion to suppress an impermissibly suggestive and unreliable photo identification.

VI: Appellant's trial counsel was ineffective.

VII: Appellant's conviction was against the manifest weight of the evidence.

## VI. Manifest Weight

**{¶48}** We address appellant's manifest-weight claim first, raised under the seventh assignment of error. While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest-weight challenge questions whether the state has met its burden of persuasion. *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). Unlike challenges to the sufficiency of the evidence, which raise a question of law, a manifest-weight challenge raises factual issues. When a defendant asserts that his conviction is against the manifest weight of the evidence, the court,

> "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). In evaluating a manifest-weight claim, we are guided by the principle that "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

**{¶49}** Garcia challenges Butcher's and Strong's credibility. He points out that Butcher, an addict of Percocet pills, initially lied to the police about the reason he went to Strong's house,

and he identified the defendant from the photo lineup with a mere 50 percent certainty. Regarding Strong, Garcia points out that her credibility was highly questionable because she was a heroin addict; she did not provide the police with the assailants' identity immediately; and she took a plea deal in exchange for her testimony.

{¶50} Garcia also highlights certain inconsistencies between the testimony of these two witnesses. While Butcher testified there was a knock on the door and Strong opened the door, Strong testified the two men came in without knocking. Strong testified that both assailants had a gun while Butcher testified that only the first man carried a gun. Butcher testified the second man assaulted him with his fists while Strong testified the second man hit Butcher with a gun. Garcia also argues his witnesses offered a strong alibi and that their testimony was more credible than the state's two witnesses. He additionally contends that the police failed to thoroughly investigate the robbery and no physical evidence connected him to the crime.

{¶51} Our careful review of the nearly 2,000 pages of the trial transcript reflects that this case hinged heavily on Angel Strong's credibility. She testified that she knew Garcia from past drug transactions. Although she was initially unable to provide the police with any information about him other than his nickname Pito, she was later able to help the police identify him through his Facebook page when he showed up as "People You May Know" under the name Pistol Papa Pete on her Facebook page.

{¶52} The robbery victim Butcher had always maintained to the police that he would be able to identify the first, but not the second, assailant, because he and the first assailant made eye contact. Although unable to identify Garcia from the photo lineup with more than 50 percent certainty, Butcher identified Garcia in court with 100 percent certainty.

**{¶53}** Although Butcher's testimony differed from Strong's testimony in certain specific details of the robbery, we note that the jury had the ability to resolve the differences in the testimony and a defendant is not entitled to a reversal on manifest-weight grounds merely because testimony at trial was inconsistent in some respects. *State v. Cook*, 10th Dist. Franklin Nos. 02AP-896 and 02AP-897, 2003-Ohio-2483.

**{¶54}** Strong's credibility was further boosted by one of the defense's own witnesses. Strong only knew Garcia as Pito and referred to him as Pito throughout her testimony. Garcia's sister and mother referred to Garcia exclusively as "Tim" in their testimony. Only when Garcia's cousin Jeffrey Perez inadvertently referred to Garcia as Pito in his testimony was it revealed that his family members called him "Pito." This testimony crucially corroborated Strong's testimony that she only knew the first assailant as "Pito."

**{¶55}** Although Garcia offered alibi witnesses, the jury was free to believe the testimony offered by the state and reject the defendant's alibi. *State v. Range*, 2d Dist. Montgomery No. 15301, 1997 Ohio App. LEXIS 4474, *7-8 (Sept. 30, 1997). The jury was fully aware that Strong was a heroin addict at the time of the robbery and that she was also indicted in this case but took a plea bargain in exchange for her testimony at trial. The trier of fact was in the best position to weigh the credibility of the witnesses. It is not our function, but that of the jury, to determine the credibility of the witnesses.

**{¶56}** In returning a verdict of guilty, the jury here was obviously convinced by the credibility of the state's witnesses, and reasonably so, given the amount of corroboration to the key witness's testimony. Deferring to the jury's assessment of credibility, as we must, we cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice that

Garcia's conviction must be reversed and a new trial ordered.   The seventh assignment of error is overruled.

## VII. Evidentiary Issues

**{¶57}** Garcia's first, second, third, and fourth assignments of error concern the admissibility of the state's evidence: (1) photographs of him introduced during the cross-examination of his sister showing him holding a gun, flashing a large stack of cash, and making an alleged gang sign; (2) testimony from a police detective offered by the state as a rebuttal witness regarding the alleged gang sign and the gang's violent activities; and (3) testimony from his mother on cross-examination regarding his family's involvement with drugs and his prior drug case.

**{¶58}** After a thorough review of the transcript and applicable law, we conclude that the challenged evidence and testimony were admissible because they were introduced either to rebut the character evidence offered by the defense or to impeach the defense's witnesses, which were permissible under Evid. R. 404(A)(1) or 616(C), respectively.

**{¶59}** We organize our analysis by the three categories of evidence challenged rather than addressing the assignments of error in the order presented: (1) the photographs; (2) the testimony of the state's rebuttal witness regarding the gang sign and the gang; and (3) testimony regarding the family's drug use and the defendant's prior drug case.

**{¶60}** We approach our review of the claims relating to evidentiary issues with the recognition that the admission of evidence is within the sound discretion of the trial court and a reviewing court will not reverse a trial court's decision absent an abuse of discretion.   *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987).

## 1. Photographs

{¶61} The first assignment of error relates to the trial court's admission of the Facebook photos that showed Garcia holding a gun, displaying a large stash of cash, and making an alleged gang sign.

{¶62} Garcia argues the Facebook photographs were irrelevant and therefore not admissible under Evid.R. 402. He argues that, even if they were relevant, their probative value is outweighed by the danger of unfair prejudice and therefore should have been excluded, pursuant to Evid.R. 403(A).

{¶63} We agree that the photographs may well be irrelevant in the state's case-in-chief to the issue of whether Garcia committed the armed robbery on New Year's Eve. Furthermore, these photographs showing him toting a gun[1] and flashing an alleged gang sign were undisputedly character evidence, and would have been improper under Evid.R. 404. That rule governs the admissibility of character evidence, and it states:

> (A) Character evidence generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, subject to the following exceptions:
>
> (1) Character of accused. Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same is admissible * * *.
>
> * * *
>
> (B) Other crimes, wrongs or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

---

[1]The trial court initially ruled at a pretrial hearing on a motion to suppress that the gun should be cropped out of the picture to avoid its prejudicial effect. The trial court subsequently allowed the uncropped picture when the photograph was introduced during the state's cross-examination of Garcia's sister.

**{¶64}** Evid.R. 404(A) prohibits evidence of a person's character to show that he acted "in conformity therewith on a particular occasion." Therefore, the state would be prohibited to introduce these photographs to show Garcia was a gun-toting gang member with a propensity to commit violent crimes and that he committed the armed robbery "in conformity therewith."

**{¶65}** Indeed, the state, appropriately, did not introduce the photographs as exhibits during its case-in-chief. These Facebook photographs were only briefly alluded to — without any testimony regarding their content — in Angel Strong's and Det. Gonzalez's testimony to explain how Strong helped the police identify Garcia as one of the assailants during the investigation of this case.

**{¶66}** The photographs were introduced as exhibits by the state and admitted by the court during the cross-examination of Garcia's sister, *after* the defense introduced testimony from Garcia's sister on her direct examination regarding Garcia's character. The defense counsel asked Garcia's sister whether Garcia has been involved in anything violent, whether she considered her brother a violent person, whether she knew him to be involved in a gang, and whether she knew him to possess any kind of weapon. To all these questions, she answered "no." She emphasized that the family had "never seen him violent ever" to anyone, that she did not see him as a violent person, and that he was very gentle with younger family members.

**{¶67}** The import of the testimony from Garcia's sister was clearly to show that the violent offense of armed robbery would not be behaviorally compatible with Garcia's character — he was not known to have a gun or to be a member of a street gang; he was gentle and not violent.

H

**{¶68}** By eliciting testimony from a witness vouching for the defendant's peaceful character, the defense "opened the door" for the prosecution, which was then permitted to rebut that testimony. Evid.R. 404(A)(1). As noted in the Staff Notes to Evid.R. 404(A)(1), the rule permits a criminal defendant to choose to "offer evidence of his good character as proof that he did not commit the act charged because such conduct is not in accord with his character"; when the accused "offers evidence of his good character, then and only then, can the prosecution offer evidence of the bad character of the accused." *See also State v. Smith*, 84 Ohio App.3d 647, 662, 617 N.E.2d 1160 (2d Dist.1992) (by opening the issue of his character in that manner, the accused permits the state to rebut with character evidence tending to show his propensity to commit the acts and offenses alleged); *State v. Eldridge*, 12th Dist. Brown No. CA2002-10-021, 2003-Ohio-7002, ¶ 42.

**{¶69}** Because the defense opened the door and placed Garcia's character at issue, the state was entitled to rebut that testimony with photographic evidence depicting him in a light contradictory to his sister's testimony — Garcia toting a gun and making a hand sign showing his gang affiliation. The trial court did not abuse its discretion in permitting the introduction of the photographs into evidence.

## 2. Rebuttal Witness Regarding the Gang Sign and Gang Activities

**{¶70}** Under the fourth assignment of error, Garcia argues the trial court erred in permitting the state to offer a rebuttal witness to testify about the gang sign shown in the photographs and the gang's violent activities.

**{¶71}** Evidence of gang membership is analyzed under Evid.R. 404. *State v. Huff*, 145 Ohio App.3d 555, 565, 763 N.E.2d 695 (1st Dist.2001). Such evidence is not admissible to

prove that a defendant is a person of bad character and therefore more likely to commit the alleged offense. *Id.*

{¶72} Here, there was no indication from the state's case-in-chief that the robbery was related to the gang and testimony about the gang would have been irrelevant evidence. Indeed, the state introduced no evidence to show the defendant was a member of a gang.

{¶73} However, because Garcia's counsel placed his character at issue, eliciting testimony from the defense witnesses that he was not violent and not in gang activities — presumably characteristics inconsistent with armed robbery — it opened the door for the state's rebuttal witness to show the hand sign flashed by Garcia was unique to a violent gang that operated in Garcia's neighborhood. *State v. Kerr*, 8th Dist. Cuyahoga No. 80272, 2002-Ohio-4190 (defendant placed his peaceable character in issue and thus opened the door for the state's rebuttal witnesses).

{¶74} Admission of rebuttal witness is within the trial court's discretion. *State v. McNeill*, 83 Ohio St.3d 438, 446, 700 N.E.2d 596 (1998). We find no abuse of discretion in the trial court's admitting the rebuttal testimony under Evid.R. 404(A)(1).

**3. Family's Involvement in Drugs and Defendant's Prior Drug Case**

{¶75} The defense counsel also asked Garcia's sister whether she associated with any drug user or drug dealers. She answered "no." In response to that testimony, the state asked Garcia's mother a series of questions about her family's involvement in drugs and Garcia's prior drug case.

{¶76} The evidence of the family's drug use and Garcia's prior drug case was irrelevant to whether Garcia was involved in the robbery. The state argues its elicitation of the mother's testimony regarding the family and Garcia's drug use was permissible under Evid.R. 616 because

the testimony was elicited to impeach her daughter's testimony denying any association with drug offenders.   We agree.

{¶77} Evid.R. 616(C) allows a witness to be impeached by "specific contradiction": "[f]acts contradicting a witness's testimony may be shown for the purpose of impeaching the witness's testimony."

{¶78} As explained in the Staff Notes to this rule, there are two distinct methods of impeachment by contradiction: self-contradiction and "specific contradiction." Self-contradiction involves the use of a witness's own prior inconsistent statement to contradict the witness's testimony in court, a situation governed by Evid.R. 613.   "Specific contradiction," on the other hand, involves the use of the testimony of one witness to contradict the testimony of another witness, a situation governed by Evid.R. 616(C).

{¶79} "Specific contradiction" was the impeachment method employed by the state here when it elicited Garcia's mother's testimony to contradict his sister's testimony.   We note that the issue of Garcia's family's drug use was a collateral matter in this case — it was not material to the issue of whether Garcia committed the armed robbery.   Generally, a witness may not be impeached by evidence that contradicts the witness's testimony on a matter that is merely collateral.   *Byomin v. Alvis*, 169 Ohio St. 395, 396, 159 N.E.2d 897 (1959).   However, as the Staff Notes to Evid.R. 616(C) notes, the common law does not prohibit a party from *cross-examining* a witness on a collateral matter — it only prohibits the introduction of extrinsic evidence on the issue, the policy underlying the "collateral matters rule" being to avoid surprise, jury confusion, and wasted time.

H

**{¶80}** The transcript reflects that Garcia's sister testified that she was not associated with any drug abusers or drug dealers. The state attempted to impeach that testimony during the cross-examination of Garcia's mother, asking his mother if her family had ever been involved with drugs. His mother admitted that two of her brothers and she had dealt with drug abuse. She initially did not mention her son — the defendant — had also abused drugs, but later acknowledged that her son abused drugs as well and had been arrested for drugs and placed into a drug treatment program in a prior case.

**{¶81}** The state's impeachment by "specific contradiction" is permissible under Evid.R. 616(C), which allows impeachment by eliciting testimony from one witness that conflicts with the testimony of another witness. Although the family and the defendant's drug use and his placement in a drug treatment program was a collateral matter — it was not material to whether the defendant was guilty of the armed robbery — the state elicited the impeachment testimony during its *cross-examination* of her, as permitted.[2]

**{¶82}** Garcia argues that the trial court should have granted his motion for a mistrial after his mother testified about his prior drug case. Garcia claims that the evidence was "other acts" evidence prohibited by Evid.R. 404(B). He argues that the sole purpose of the testimony regarding his completion of an "intervention in lieu of conviction" program in a prior drug case

---

[2]For this reason, although the state's rebuttal witness, Det. Staimpel, was permitted to rebut the character testimony put forth by the defendant, this rebuttal witness would not have been permitted if the purpose of his testimony was for impeachment. This is because although it is permitted for a party to impeach by cross-examining a witness on a collateral matter (which Garcia's gang affiliation is), it is impermissible to introduce extrinsic evidence (such as bringing in a rebuttal witness) to impeach a witness's testimony on the collateral issue. Staff Notes to Evid.R. 616(C); *State v. Cochrane*, 151 Ohio St. 128, 135, 84 N.E.2d 742 (1949) ("The cross-examiner is not permitted to introduce rebuttal evidence to contradict the witness on collateral matters."). Thus, the state's rebuttal witness would be improper under Evid.R. 616(C), although the witness was permitted under Evid.R. 404(A)(1), as we explain above.

was to prejudice the jury and imply that a prior arrest made it more likely that he committed the instant robbery.

**{¶83}** A mistrial is declared "only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991), citing *Illinois v. Somerville*, 410 U.S. 458, 462-463, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). Furthermore, trial courts enjoy broad discretion in ruling on motions for mistrial. *State v. Iacona*, 93 Ohio St.3d 83, 100, 752 N.E.2d 937 (2001). Absent an abuse of discretion, a reviewing court will not reverse a trial court's decision regarding a motion for a mistrial. *State v. Benson*, 8th Dist. Cuyahoga No. 87655, 2007-Ohio-830, ¶ 136.

**{¶84}** We have determined in the foregoing that the testimony regarding the defendant's drug use and prior drug case was not improper for impeachment purposes. Furthermore, the record here reflects that the trial court provided an appropriate curative instruction to the jury to ensure that the jury understood the purpose and import of the testimony regarding the defendant's prior drug case. The court stated:

> THE COURT: All right, folks. So the word conviction used with respect to any other prior cases involving the defendant, first of all, you can't use that fact to say he's guilty in this case. What happened in those programs, he tenders a guilty plea, no conviction is entered. If successful with the program, then the case is dismissed, okay, so that was the nature of that program if he successfully completes the drug program, okay?
>
> All that testimony was used for was to impeach the credibility for you to determine whether or not the other witnesses are believable. That witness testifying is believable, the characterization of the direct testimony from the defendant. That's the only purpose whatsoever.

**{¶85}** A jury is presumed to follow any curative instructions given by the trial court. *State v. Henderson*, 39 Ohio St.3d 24, 33, 528 N.E.2d 1237 (1988). Nothing in the record

indicates the jury failed to follow the curative instruction. The trial court did not abuse its discretion in not granting a mistrial requested by Garcia.

{¶86} Finally, Garcia argues that all of the above evidence — the photographs, gang evidence, and prior drug involvement — were highly prejudicial. We are aware that evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice. Evid.R. 403(A). However, the trial court has broad discretion in determining whether unfair prejudice substantially outweighs probative value under Evid.R. 403(A). We do not interfere or second guess its decision absent a clear abuse of that discretion. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 40. Here, Garcia put on his sister and mother to provide an alibi defense for him, and they also offered testimony of Garcia's good character to show that a commission of armed robbery would be inconsistent with his character. As such, these witnesses' credibility was highly crucial to the state's case. Consequently, we cannot say that the probative value of the rebuttal or impeachment evidence offered by the state was substantially outweighed by the danger of unfair prejudice. The trial court did not abuse its discretion in admitting the evidence.

{¶87} Based on the foregoing analysis, the first, second, third, and fourth assignments of error lack merit.

**VIII. Photo Identification**

{¶88} In the fifth assignment of error, Garcia claims that the trial court erred when it denied his pretrial motion to suppress the victim's identification of him from a photo lineup.

{¶89} "An identification derived from unnecessarily suggestive procedures, which have a likelihood of leading to a misidentification, violates a defendant's right to due process." *State v.*

*Fields*, 8th Dist. Cuyahoga No. 99750, 2014-Ohio-301, ¶ 10, citing *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

{¶90} The burden of demonstrating that the procedures utilized were unnecessarily suggestive is on the defendant. *State v. Quarterman*, 8th Dist. Cuyahoga No. 99317, 2013-Ohio-4037, ¶ 26. "If the defendant meets that burden, the court must consider whether the identification, viewed under the totality of the circumstances, is reliable despite its suggestive character." *Fields* at ¶ 10, citing *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *see also State v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, 940 N.E.2d 634 (10th Dist.). If, on the other hand, the pretrial procedures were not unnecessarily suggestive, "any remaining questions as to reliability go to the weight of the identification, not its admissibility, and the identification is admissible." *Fields* at ¶ 10, citing *State v. Wills*, 120 Ohio App.3d 320, 324, 697 N.E.2d 1072 (8th Dist.1997).

{¶91} Garcia claims the police should have used a "folder system" — whereby a single photo in a folder is shown to a witness in a sequential manner — instead of the photo array employed in the instant case.

{¶92} R.C. 2933.83 governs the administration of photo lineups in Ohio, and it is aimed at preventing the use of unnecessarily suggestive procedures. *Fields,* 8th Dist. Cuyahoga No. 99750, 2014-Ohio-301, at ¶ 11. R.C. 2933.83 requires any law enforcement agency that conducts live and photo lineups to adopt specific procedures for conducting the lineups. This court has held that R.C. 2933.83 does not require the use of the "folder system" and that the "folder system" is just one of the systems law enforcement agencies may employ for photo lineup identifications. *State v. Wells*, 8th Dist. Cuyahoga No. 98388, 2013-Ohio-3722, ¶ 77. What

R.C. 2933.83(B) does require is the use of a "blind administrator" for a photo array, which means the administrator does not know the identity of the suspect.

{¶93} The testimony at the suppression hearing here showed that a blind administrator, who was not involved in the investigation and did not know Garcia, showed the photo array to the victim Ronnie Butcher, who circled Garcia's photo, initialed it, and dated it.

{¶94} Garcia also claims that the photo array was compiled such that his picture was noticeably different from the others, and that his identification was unreliable because Butcher was only 50 percent sure the photo he selected was the man who robbed him.

{¶95} Despite his claim, Garcia has not demonstrated that his picture in the photo array was unnecessarily suggestive. The detective testified that the array was constructed to ensure that the accompanying images had similar physical characteristics to Garcia: Hispanic males with brown skin and some facial hair. As to Butcher's acknowledgment that he was only 50 percent sure that the photo he selected showed the first assailant, it was an issue of reliability and it goes to the weight of the identification, not its admissibility. The weight of evidence is a matter for the jury. The fifth assignment of error is overruled.

## IX. Ineffective Assistance of Counsel

{¶96} In the sixth assignment of error, Garcia claims that his trial counsel was ineffective because counsel's questioning of the defenses witnesses "opened the door" to questions about Garcia's gang involvement and drug use.

{¶97} In order to establish a claim of ineffective assistance of counsel, Garcia must prove (1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In Ohio, every

properly licensed attorney is presumed to be competent and, therefore, a defendant claiming ineffective assistance of counsel bears the burden of proof. *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). And counsel's performance will not be deemed ineffective unless and until the performance is proven to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. *Iacona*, 93 Ohio St.3d 83, 105, 752 N.E.2d 937.

{¶98} In evaluating whether the defendant has been denied the effective assistance of counsel, the Ohio Supreme Court held that the test is "whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done." *State v. Hester*, 45 Ohio St.2d 71, 341 N.E.2d 304 (1976), paragraph four of the syllabus. When making that evaluation, a court must determine "whether there has been a substantial violation of any of defense counsel's essential duties to his client" and "whether the defense was prejudiced by counsel's ineffectiveness." *State v. Lytle*, 48 Ohio St.2d 391, 358 N.E.2d 623 (1976); *State v. Calhoun*, 86 Ohio St.3d 279, 714 N.E.2d 905 (1999).

{¶99} In evaluating a claim of ineffective assistance of counsel, we are mindful that there are countless ways for an attorney to provide effective assistance in a given case and we must give great deference to counsel's performance. *Strickland* at 689. Trial tactics and strategies do not constitute a denial of effective assistance of counsel. *State v. Gooden*, 8th Dist. Cuyahoga No. 88174, 2007-Ohio-2371, ¶ 38, citing *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980).

{¶100} The elicitation of testimony from the defendant's family members was part of the defense strategy to show the armed robbery was not consistent with Garcia's character. With hindsight, it was a debatable tactic. A debatable decision involving trial tactics, however, does

not generally constitute a deprivation of effective counsel. *State v. McCuller*, 8th Dist. Cuyahoga No. 86952, 2006-Ohio-302, ¶ 46, citing *State v. Phillips*, 74 Ohio St.3d 72, 656 N.E.2d 643 (1995). "[T]he fact that there was another and better strategy available does not amount to a breach of an essential duty to [one's] client." *Clayton* at 49.

{¶101}    Our review of the record shows Garcia's trial counsel zealously represented her client throughout the trial. Although much damaging information about her client was allowed into evidence, counsel objected strenuously to their admission and argued vigorously for their exclusion. She asked for a mistrial on multiple occasions. We also note that before trial, she interviewed witnesses, filed motions on her client's behalf including a motion to suppress, employed her office's investigator, and presented an expert witness to testify for the defense. Although the tactical decision to inquire into the defendant's character turned out to be questionable in hindsight, we cannot say she provided constitutionally ineffective assistance of counsel or her performance fell below an objective standard of reasonableness.

{¶102} The sixth assignment of error is overruled.

{¶103} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, JUDGE

MARY J. BOYLE, J., CONCURS;
LARRY A. JONES, SR., A.J., DISSENTS IN PART AND CONCURS IN PART

LARRY A. JONES, SR., A.J., DISSENTING IN PART AND CONCURRING IN PART:

{¶104} Respectfully, I dissent in part and concur in part. I agree that the first and fifth assignments of error, which challenged the admission of photographic evidence and the motion to suppress, should be overruled. I find, however, that the second and fourth assignments of error have merit.

{¶105} First, the trial court erred by permitting the state to elicit improper witness testimony about Garcia's family's involvement in drugs and his prior drug case. As the majority admits, the mother's testimony about her past drug use, her criminal convictions, her family's drug history, and Garcia's prior drug case had no relevance to whether Garcia committed the crimes for which he was charged, yet the trial court allowed it all into evidence. "Evid.R. 616 does not swing open the door for cross-examination in an effort to establish a witness' prior bad acts or criminal character." *State v. Haddix*, 12th Dist. Warren No. CA2011-07-075, 2012-Ohio-2687, ¶ 13.

{¶106} The majority concluded that the state was permitted to elicit impeachment testimony during its cross-examination of the mother pursuant to Evid.R. 616(C) through "specific contradiction" about collateral matters because it was used to impeach her daughter's testimony. I disagree.

**{¶107}** The majority notes that common law does not prohibit a party from cross-examining a witness on a collateral matter — it only prohibits the introduction of extrinsic evidence on the issue — and concludes that Garcia's mother's testimony was not extrinsic evidence. I disagree. When Garcia's mother testified on cross-examination about drug use and past convictions and cases, she was testifying about a matter collateral to the material issues at trial. The state contends it was using the mother's testimony as impeachment evidence. But the state is not permitted to elicit impeachment testimony about a collateral matter using extrinsic evidence — such as eliciting testimony from one witness that conflicts with the testimony of another witness.

**{¶108}** As the majority notes, the Staff Notes to Evid.R. 616(C) state that the common law rule does not prohibit a party from cross-examining on a "collateral matter," but prohibits the introduction of extrinsic evidence on the issue. Extrinsic evidence is defined in the Staff Notes to Evid.R. 616(C) as follows:

> Extrinsic evidence defined. In the impeachment context, extrinsic evidence means evidence introduced through the testimony of other witnesses. *See* 1 McCormick, Evidence § 36, at 118 (4th Ed.1992) ("Extrinsic evidence, that is, the production of attacking witnesses * * * is sharply narrowed for obvious reasons of economy of time and attention."). Accordingly, documentary evidence offered through the witness being impeached is not extrinsic evidence because it typically does not consume much additional time.

**{¶109}** The Staff Notes to Evid.R. 616 plainly state that extrinsic evidence is evidence introduced through the testimony of another witness. Thus, Garcia's mother's testimony about familial drug use used to impeach her daughter's testimony was, in fact, extrinsic evidence.

And, as the majority admits, family drug use was a matter collateral to the issues in the case. Therefore, the state should not have been allowed to disprove the truth of Garcia's sister's answers by introducing extrinsic evidence in the form of Garcia's mother's testimony. *See State v. Wilson*, 2d Dist. Montgomery No. 22120, 2008-Ohio-4130.

{¶110} I would also find it impermissible that the state asked Garcia's mother whether her daughter was being truthful when the daughter testified that no one in her family was involved in drugs. "[T]he opinion of a witness as to whether another witness is being truthful is inadmissible." *State v. Huff*, 145 Ohio App.3d 555, 561, 765 N.E.2d 695 (10th Dist.2001). This is especially apparent in a case like this where there was a separation of witnesses so the mother did not hear her daughter's testimony — any opinion the mother gave as to the truthfulness of her daughter's testimony was purely speculative.

{¶111} None of the exceptions set forth in Evid.R. 616 apply to this case. Moreover, even if Evid.R. 616 applied, I would find that any probative value would have been substantially outweighed by the danger of confusing the issues or misleading the jury. Simply put, through the misapplication of Evid.R. 616, the state was able to set forth, through the defendant's own witnesses, testimony that Garcia came from a family of drug users, drug traffickers, felons, and had himself been charged with a felony drug crime. Even with the trial court's limiting instruction, it is doubtful that this did not impact the jury's deliberation on material issues in the case.

{¶112} I would also find that the trial court erred to the prejudice of Garcia when it allowed Detective Staimpel to testify on rebuttal about the BBE 900 gang. He testified that he was not familiar with the case and did not know Garcia, but was a self-described "expert" on the BBE 900 gang. The detective testified specifically that the BBE 990 was a violent gang

"known to rob people, jump people, [and] assault them. They intimidate people. They harass citizens. We have dozens of examples where they jumped on people that are seemingly just walking down the street for no reason." The detective explained how the gang used social media to brag after committing crimes and to post songs, videos, and pictures of themselves, sometimes posing with firearms. He further explained that gang members refuse to fight "one-on-one," preferring to group together to commit violent crimes. He also related a previous incident where "one gang member * * * actually shot another gang member in the back of the head and killed him back in July. * * * I can't explain the mentality of these kids when you interview them. It just doesn't make any sense but they're very dangerous."

{¶113} The detective's testimony was clearly improper under Evid.R. 404(A). As the majority concedes, the state presented no evidence that Garcia was in any gang (let alone the BBE 900), that the robbery was part of gang activity, and any testimony about the gang would have been irrelevant. Therefore, even if Garcia "opened the door" for the state's rebuttal witness to show the hand sign flashed by Garcia was unique to the BBE 900, the detective's testimony should have been limited to that issue. Instead, the court let the state question the detective ad nauseam about the gang and how it operated, which served no purpose other than to inflame the jury.

{¶114} "Gangs generally arouse negative connotations and often invoke images of criminal activity and deviant behavior. There is therefore always the possibility that a jury will attach a propensity for committing crimes to defendants who are affiliated with gangs or that a jury's negative feelings toward gangs will influence its verdict." *United States v. Irvin*, 87 F.3d 860, 865 (7th Cir.1996).

{¶115} The case the majority relies on, *Kerr*, 8th Dist. Cuyahoga No. 80272, 2002-Ohio-4190, is easily distinguishable. *Kerr* involved rebuttal character witnesses who had personally observed the defendant's violent behavior. *Huff*, 145 Ohio App.3d 555, 763 N.E.2d 695, is more persuasive. In *Huff*, the prosecutor asked the defendant on cross-examination to display and explain his tattoos to the jury; the prosecutor then used the tattoos to argue the defendant was in a gang. The appellate court found that the decision to admit the defendant's tattoos and references to gang affiliation was unreasonable because no witnesses claimed the assailant had a particular tattoo and there was no explanation linking the tattoos to gangs or evidence that gang activity was relevant to the case. The court concluded that the tattoo evidence could be viewed as inflammatory and an attack on the defendant's character. *Id.* at 566.

{¶116} Likewise, in this case, the detective's inflammatory testimony about a violent and dangerous gang was a blatant attempt by the state to prejudice the jury against Garcia. I would find that the trial court abused its discretion when it allowed the testimony into evidence.

{¶117} Therefore, I would sustain the second and fourth assignments of error and reverse and remand for a new trial.